UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

CRIMINAL NO. 25-20566

v.

HON. JUDITH E. LEVY

TERRI RAMSEY,

Defendant.

________________________________/

**Government's Sentencing Memorandum**

During the COVID-19 pandemic, defendant Terri Ramsey, a State of Michigan Unemployment Insurance Agency employee, sold public services for her private gain. She accepted tens of thousands of dollars of bribes to improperly access and release unemployment insurance assistance claims, some of which were fraudulent. In total, she caused the improper release of more than a million dollars of unemployment insurance assistance claims.

Ramsey's Guidelines range is 57 to 60 months' imprisonment. The United States recommends that the Court impose a sentence of 57 months' imprisonment.

## I. Facts and Procedural History

Ramsey was an employee of the Michigan Unemployment Insurance Agency from 2018 to 2022. During that time, she held various titles, including advocacy

specialist, benefit accuracy measurement coordinator, and claim examiner. (PSR ¶45.) From at least April 2020 through July 2021, she conspired with others to commit federal program bribery. By accepting bribes, Ramsey sought to enrich herself. In return, she used her access as a State of Michigan employee to improperly access and release unemployment insurance claims for payment. She improperly dismissed and closed fraud prevention triggers and information requests for claims, some of which were fraudulent. (PSR ¶9.) More than $1.028 million in claims were improperly paid out after her unauthorized access.

On December 8, 2025, Ramsey was charged by information with one count of conspiring to commit federal program bribery, in violation of 18 U.S.C. § 371. (ECF No. 25.) On February 25, 2026, Ramsey entered a guilty plea to those charges pursuant to a Rule 11 plea agreement. (ECF No. 51.)

## II. <u>The Sentencing Guidelines</u>

The probation officer correctly calculated the Guidelines. Consistent with the parties' agreed-upon recommendations, the base offense level is 14, as the defendant was a public official who conspired to commit federal program bribery. U.S.S.G. §§ 2X1.1(a), 2C1.1(a)(1). A two-level enhancement applies because the offense involved more than one bribe. U.S.S.G. § 2C1.1(b)(1). An additional fourteen-level increase applies because the value of the benefit received in return for the payment was more than $550,000 and less than $1.5 million. U.S.S.G. §§ 2C1.1(b)(2), 2B1.1.

Ramsey accepted responsibility by pleading guilty in a timely manner, resulting in a three-level reduction under U.S.S.G. § 3E1.1. Ramsey also receives a two-level decrease for being a zero-point offender. U.S.S.G. § 4C1.1(a). Given a resulting total offense level of 25 and a Criminal History Category I, Ramsey's initial Guidelines range is 57 to 71 months. The statutory maximum for her offense is 60 months, however, and thus her applicable Guidelines range is 57 to 60 months. U.S.S.G. § 5G1.1(c)(1).

## III. Section 3553(a) Factors

The Court must consider the 18 U.S.C. § 3553(a) factors in fashioning a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing. The Supreme Court has noted that, in formulating the Sentencing Guidelines, the U.S. Sentencing Commission's goal is to carry out the objectives of § 3553(a). *United States v. Rita*, 551 U.S. 338 (2007). While advisory, the Guidelines remain an important factor in fashioning a just sentence. This is because "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Id.* at 350. Moreover, the guidelines "should be the starting point and the initial benchmark" for choosing a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). Here, the starting point is 57 to 60 months' imprisonment. (PSR ¶51.) The nature and circumstances of the offense, the need to promote respect for

the law, and the need to afford adequate deterrence support a prison sentence of 57 months.

**a. The Nature and Circumstances of the Offense**

Terri Ramsey put government services up for sale. While others were scrambling to react to a once-in-a-lifetime pandemic, Ramsey quickly found a way to take advantage of the situation for personal profit. She received bribes from multiple third parties who referred unemployment insurance claimants to her. In exchange, Ramsey accessed unemployment insurance assistance claim information without authorization, improperly dismissed and closed fraud prevention triggers and information requests relating to claims, and caused improper payments to be issued.

Having begun to work at the State of Michigan Unemployment Insurance Agency in 2018, Ramsey had already been a civil servant for a few years before her bribery scheme began. Yet, there was not a slow ramp-up period to Ramsey's acceptance of bribes during the COVID-19 pandemic. As the Court will recall, the pandemic hit in March 2020. On March 23, 2020, Governor Whitmer signed the Stay Home, Stay Safe Order for the State of Michigan. (MI Executive Order 2020-21). Less than three weeks later, Ramsey was already soliciting bribes:

**Author** [redacted] (Facebook: 571532192)
**Sent** 2020-04-11 01:52:04 UTC
**Body** What type.of ppl.we need?

**Author** Tbaby Ramsey (Facebook: 100000702076178)
**Sent** 2020-04-11 01:53:12 UTC
**Body** We need ppl who stuff say additional claim required,
Or nonmonetary issue

Quick easy fixes or someone need to FILE a claim

**Author** [redacted] (Facebook: 571532192)
**Sent** 2020-04-11 01:56:07 UTC
**Body** Oh. I got one

From the beginning, Ramsey was not a passive recipient but rather actively sought out bribes:

**Author** Tbaby Ramsey (Facebook: 100000702076178)
**Sent** 2020-04-11 02:08:36 UTC
**Body** Get 2 more like that

**Author** Tbaby Ramsey (Facebook: 100000702076178)
**Sent** 2020-04-11 02:08:49 UTC
**Body** Or who need to File a claim

**Author** [redacted] (Facebook: 571532192)
**Sent** 2020-04-11 02:09:20 UTC
**Body** I got 2 who need to file a claim

**Author** Tbaby Ramsey (Facebook: 100000702076178)
**Sent** 2020-04-11 02:09:39 UTC
**Body** Yessssss o.k

**Author** Tbaby Ramsey (Facebook: 100000702076178)
**Sent** 2020-04-11 02:10:16 UTC
**Body** Good we good for tomorrow. U know my Cashapp

**Author** [redacted] (Facebook: 571532192)
**Sent** 2020-04-11 02:10:28 UTC
**Body** Nope

She also set her price. (PSR ¶12 ("Tell her 50$ damn…").)

Ramsey may argue that she was trying to help people during the pandemic, but her motive was not altruistic. Ramsey's "help" did not come free. She sold

government services for her own private gain, earning tens of thousands of dollars in exchange. Ramsey kept meticulous track of the claimants for whom she was being paid. During the execution of a search warrant at Ramsey's residence, agents found a notebook that contained her notes on the scheme, including a detailed ledger.

Take, for example, May 1, 2020. This was just a couple of weeks after Ramsey started soliciting bribes, as described above, and only a month and a half into the pandemic. For this date, Ramsey filled nearly every line of the page of her notebook with claimants. Next to these names she marked which unindicted individual had referred the claimant to her. (*See* PSR ¶11.) When the unindicted individuals paid Ramsey the bribes via Cash App, they listed the first and/or last name of the claimant for tracking purposes. On May 1, 2020, there were 21 such payments to Ramsey, listing names that matched that date's page of Ramsey's notebook. These 21 payments totaled $1,070—more than double Ramsey's legitimate wages that day.[1]

Some of the claims that Ramsey improperly pushed through were fraudulent. (PSR ¶9.) While Ramsey may not have directly *known* that any particular claim was fraudulent, she improperly dismissed and closed fraud prevention triggers and

---

[1] Ramsey tracked her hours as a State of Michigan employee in her notebook. For the week of May 1, 2020, Ramsey's notes indicate that she had already worked more than 40 hours prior to May 1, on which she worked from 7 a.m. to 6:30 p.m. Her hourly pay was $25. (PSR ¶45.)

information requests for claims. (*Id.*) She thus removed the very guardrails that the State of Michigan had established to try to prevent fraudulent claims.

Moreover, Ramsey's solicitation of bribes was harmful, in and of itself. By its nature, bribery violates fundamental principles of fairness and equality, regardless of whether any particular claim that Ramsey improperly processed—in exchange for personal payment—was legitimate or fraudulent. Bribery erodes the public's trust in government and its decisions. It makes the government less responsive. While such harm can be intangible, it is self-evident that the processing of some claims was delayed because others, by paying Ramsey, jumped the line. Bribery also makes government less efficient—here, for example, Ramsey processed claims based not on her role as an employee of the State of Michigan Unemployment Insurance Agency but rather based on who was willing to pay.

**b. History and Characteristics of the Defendant**

To her credit, Ramsey has a long and consistent employment history. She is gainfully employed, working not only a full-time job but also running her own catering business. (PSR ¶¶43–44.) While commendable, this did not stop her from taking advantage of a global pandemic to enrich herself—and that reflects a heightened level of fault. *See, e.g.*, *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Criminals who have the education and training that enables people

to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.”).

Ramsey lacks any prior criminal history, which is reflected in her Guidelines level both as a zero-point offender and as a Criminal History Category I. And although Ramsey is technically a “first-time criminal” because she has no prior convictions, Ramsey’s offense was not a single act of aberrant behavior. Rather, she engaged in criminal activity on countless occasions, accepting numerous bribes over a sustained period of time. This differentiates Ramsey from first-time offenders whose conduct was actually a “one-time thing.” *See United States v. Folliet*, 574 F. App’x 651, 658 (6th Cir. 2014) (“Though Defendant might have been a ‘first time criminal’ in the sense that she had no prior convictions, the district court mentioned several times that ‘this was not a one-time thing’—Defendant stole countless times from the victim and various charities over the course of seven years.”).

Ramsey also deserves positive recognition for being a dedicated family member, raising two children. Ramsey is currently in the process of divorcing her husband, who is still involved with the children. (PSR ¶36 (describing that the children remain in the familial home while the parents rotate staying there).)

**c. Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment for the Offense**

This is a serious offense. Crimes like Ramsey’s are an attack on honest government. They cause the public to lose faith in their own government, often

causing incalculable and long-term damage to the community. These schemes also make it more difficult for deserving claimants to receive needed government assistance. Moreover, when Ramsey removed the safeguards that were placed to protect the public from fraudulent government claims, it comes as no surprise that Ramsey's conduct resulted in, on at least some occasions, fraudulent claims being processed. (PSR ¶9.) A 57-month custodial sentence would reflect the public's view that such crimes, committed by government actors, are serious and will be punished.

This was not a one-time lapse in judgment by Ramsey. It was consistent, nearly daily activity. She repeatedly made the decision to accept bribes and improperly push through unemployment claims, causing actual harm to the State of Michigan of more than one million dollars. Additionally, the Sixth Circuit has specifically highlighted the need for courts to impose sufficient sentences on white-collar defendants that reflect the seriousness of the offense, promote respect for the law, and provide just punishment without relying on impermissible considerations of collateral consequences that such defendants might be more likely to experience. *See United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("[W]hen a district court varies downward on the basis of the collateral consequences of the defendant's prosecution and conviction, the defendant's sentence will not reflect the seriousness of the offense, nor will it provide just punishment.").

**d. Adequate Deterrence and Protection of the Public**

An unambiguous message of deterrence should be sent to others who might be tempted to sell government services: a substantial prison sentence awaits you. As the Sixth Circuit has recognized, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (citations omitted). And just as a custodial sentence is necessary to reflect the seriousness of the offense, it is necessary to deter others from engaging in similar conduct.

Ramsey's conduct occurred at a time when the State of Michigan Unemployment Insurance Agency and other government entities were trying to assist those affected by the COVID-19 pandemic. The fact that Ramsey's conduct occurred during a once-in-a-lifetime global pandemic exacerbates, not mitigates, the conduct. Unlike many others, she retained her employment during the pandemic; she was not economically desperate.

Moreover, although the specific circumstances of Ramsey's offense are not likely to repeat given the infrequency of such catastrophic events, the pandemic did not make it uniquely feasible. Every day, millions of civil servants interact with the public, processing tax returns, applications for food stamps, claims for disaster relief funds, building permits, and myriad other claims and services. A 57-month sentence

in this case would serve as an important warning to any civil servant who may be tempted to put such public services for sale—this conduct will not be tolerated, and it will not be excused.

**e. Providing Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner; Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities**

Consideration of stiffer white-collar penalties applies particularly to public corruption cases. In November 2004, the Sentencing Commission amended the guidelines to increase the punishment for corrupt public officials. The Commission explained that "public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses," especially when compared with other white-collar crimes. U.S.S.G., App'x C, Vol. III, at 82 (Amendment 666). The Commission thus increased the base offense level for public officials, like Ramsey, because "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental process." *Id.*

Ramsey's Guidelines range is 57 to 60 months. The need to avoid unwarranted sentencing disparities should result in a significant custodial sentence. According to the PSR, during the last five fiscal years, the median length of imprisonment for defendants with the same offense level and criminal history as Ramsey who did not receive departures under § 5K1.1 was 41 months. (PSR ¶74

(noting also the average was 36 months).) Of these 23 defendants, 21 received a sentence of imprisonment in whole or in part.

This Court has already sentenced Ramsey's two co-defendants, Jennae Reed and Janine Rayford. Reed was sentenced to probation. (ECF No. 43.) Rayford was sentenced to 26 months' imprisonment, which included a mandatory 24-month sentence for aggravated identity theft. (ECF No. 56.) Here, a significant custodial sentence is necessary to avoid unwarranted sentencing disparity within this case.

Ramsey's conduct was more egregious than Reed's.[2] Unlike Ramsey, Reed had not worked at the State of Michigan Unemployment Insurance Agency before joining during the pandemic. She personally released just six claims during the short time she was employed by the State of Michigan; before then, she bribed co-defendant Rayford to release claims (essentially referring claims to Rayford). Thus, although Reed's loss figure was higher than Ramsey's (more than $1.7 million compared to more than $1 million), less than a hundred thousand dollars of it had occurred while Reed was a State of Michigan employee. (*Cf.* ECF No. 43 at PageID.214 (ordering Reed to pay $1,722,766 in restitution, of which $1,628,080 is joint and several with Rayford).) As reflected in the Guidelines, those who are in positions of public trust, and abuse that trust, are more culpable than those on the outside who seek to corrupt them. *See* U.S.S.G. § 2C1.1(a); U.S.S.G., App'x C, Vol.

[2] Ramsey and Reed did not engage in their respective criminal conduct together.

III, at 82 (Amendment 666). Ramsey, by comparison, was already employed at the Agency before the pandemic and, as discussed above, began abusing her position nearly immediately after the pandemic began. As a public official, Ramsey herself received bribes from third parties who sent "referrals" for claimants.

On the other hand, co-defendant Rayford's conduct was more egregious than Ramsey's in many ways.[3] Rayford was highly educated with a master's degree and had worked as a civil servant her entire career. Rayford also admitted to, on one occasion, knowingly using a fraudulent identification for a claim, for which she pleaded guilty to aggravated identify theft. In addition, Rayford had committed other COVID-19-related fraud, having received more than $20,000 from a fraudulent Paycheck Protection Program (PPP) loan application. (ECF No. 11 at PageID.32.)

Thus, Ramsey's culpability would appear at first blush to lie in between her two codefendants'. But the critical difference between Ramsey and Rayford lies in how they reacted once caught. After becoming aware of the criminal investigation, Rayford took responsibility for her crimes, admitted her own conduct, and provided

[3] As the PSR described, Ramsey worked with Rayford in executing her scheme. (PSR ¶8.) Specifically, this included Ramsey, while a State of Michigan Unemployment Insurance Agency employee, paying bribes to Rayford to release claims. (*See* ECF No. 11 at PageID.30.)

substantial assistance to the government beginning in November 2023.[4] (ECF No. 54 at PageID.283–284.) Ramsey, on the other hand, chose a different path. Ramsey was the last of the three defendants in the instant matter to plead guilty. (*See* ECF Nos. 1, 11 (Rayford plea on August 28, 2025); ECF Nos. 13, 22 (Reed plea on September 24, 2025).) When Ramsey was served with a target letter and interviewed by law enforcement officers in October 2025, she lied. (Exhibit A.) During this interview, Ramsey falsely claimed that she had never accessed claims outside of the scope of her duties and denied receiving any outside payments for services related to her employment. Even after being confronted with the fact that agents had reviewed her Cash App records, Ramsey first claimed that payments were unrelated to her work with the Unemployment Insurance Agency and later claimed that they were gifts. While Ramsey has since pleaded guilty and acknowledged what she knew at the time—that she had been receiving bribes in exchange for improperly accessing and releasing unemployment insurance assistance claims—her lies to federal agents distinguish her from her codefendants. Thus, while her offense

[4] Although the United States would not typically comment publicly on a defendant's cooperation, Rayford disclosed her cooperation publicly in her sentencing paper, at her sentencing hearing, and in her recent § 2255 motion. (ECF No. 54 at PageID.276; ECF No. 78 at PageID.470–471 (confirming her attorney's representation of her willingness to discuss her cooperation publicly); ECF No. 71 at PageID.398.)

conduct may have been less egregious than Rayford's, her offense combined with her post-offense conduct warrant a 57-month sentence.

## IV. Conclusion

For the reasons discussed above, the Court should impose a term of imprisonment of 57 months.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney

*s/ Jessica Kraft*
Jessica A. Kraft
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9626
Email: jessica.kraft@usdoj.gov
P80841

Dated: September 24, 2026

**Certificate of Service**

I certify that on September 24, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Christopher Quinn
Attorney for Terri Ramsey

I also certify that I will, on today's date, email a copy of the foregoing document to Kody Belamy, the assigned probation officer in this matter.

*s/Jessica Kraft*
Jessica A. Kraft
Assistant U.S. Attorney
United States Attorney's Office